Peter H. Burke*
James Harrell
**CRUMLEY ROBERTS, LLP**
2400 Freeman Mill Road, Suite 200
Greensboro, NC 27406
Telephone: (366) 333-9899
phburke@crumleyroberts.com
jrharrell@crumleyroberts.com

Karen Hanson Riebel*
Kate M. Baxter-Kauf*
Maureen Kane Berg*
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
khriebel@locklaw.com
kmbaxter-kauf@locklaw.com
mkberg@locklaw.com

*Attorneys for Plaintiffs and Proposed
Plaintiffs' Class Counsel*

*\* Pro hac vice forthcoming*

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KIM NAUGLE and AFRIKA WILLIAMS, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> -and- <br><br> DUKE UNIVERSITY HEALTH SYSTEM, INC., WAKEMED, and a Defendant Class of Facebook Partner Medical Providers, <br><br> Defendants. | **Case No.** <br><br> <u>**COMPLAINT – CLASS ACTION**</u> <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Kim Naugle and Afrika Williams, on behalf of themselves and all others similarly situated, allege as follows upon personal knowledge as to their own conduct and on information and belief as to all other matters, based on investigation by counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery:

## I.    INTRODUCTION

1.    Plaintiffs bring this action on behalf of themselves and millions of other Americans whose medical privacy has been violated by Facebook's Pixel tracking tool. As explained herein, Defendants know (or should have known) that Facebook's Pixel tracking tool is being improperly used on hospital websites, resulting in the wrongful, contemporaneous, re-direction to Facebook of patient communications to register as a patient, sign-in or out of a supposedly "secure" patient portal, request or set appointments, or call their provider via their computing device. This unlawful transmission and collection of data is done without the knowledge or authorization of the patients, like Plaintiffs, in violation of Defendants' contracts with their users/patients, as well as in violation of various federal and state laws.

2.    When a patient communicates with a health care provider's website where the Facebook Pixel is present on the patient portal login page, the Facebook Pixel source code causes the exact content of the patient's communication with their health care provider to be re-directed to Facebook in a fashion that identifies them as a patient.

1

3.     For example, Plaintiff Naugle is a patient of the Defendant WakeMed ("WakeMed"). In the course of receiving medical care at WakeMed, Plaintiff Naugle has used WakeMed's "MyChart" patient portal to review her lab results, make appointments, and communicate with her providers.  Plaintiff Williams is a patient of Defendant Duke University Health System, Inc. ("DukeHealth"). In the course of receiving medical care at DukeHealth, Plaintiff Williams has used the "DukeMyChart" patient portal to review her lab results, make appointments, and communicate with her providers.

4.     Unbeknownst to Plaintiffs, and millions of other patients around the country, when they signed into their patient portals, the Facebook Pixel secretly deployed on the webpage sent to Facebook the fact that they had clicked to sign-in to the patient portal.

5.     The data that the Facebook Pixel causes to be re-directed from the patient's computing device to Facebook includes:

a.  That the patient was communicating with their healthcare institution via its online patient portal;

b.  That the patient engaged in an 'ev' or event called a SubscribedButtonClick;

c.  That the content of the button the patient clicked was "Login to" the patient portal;

d.  That the page from which the button the patient clicked was Patient Portal – *i.e.* Home;

e.  That the patient had previously been at a patient portal page about a particular health area/concern;

f.  The patient's Internet Protocol address;

2

g. Identifiers that Facebook uses to identify the patient and his/her device, including cookies named c-user, datr, fr, and fbp (*i.e.* Facebook Pixel); and

h. Browser attribute information sufficient to fingerprint the patient's device.

6. As explained in further detail below, patient-status is protected by HIPAA, which requires a valid HIPAA-compliant authorization before it is conveyed by medical providers or collected by Facebook.

7. Neither Facebook nor any of the Defendant health care institutions that deployed the Facebook Pixel on their web properties ("Facebook Partner Medical Providers") procured HIPAA authorizations for the disclosure of patient status and health information to Facebook.

8. In the absence of a HIPAA authorization, Facebook's collection of patient status and the content of patient communications with the Facebook Partner Medical Providers, including when patients register, log-in and logout of patient portals and set up appointments, violates Defendants' privacy promises to users.

9. Facebook promises users, that "publishers can send us information through Meta Business Tools [such as] the Meta Pixel" but Facebook "require[s] each of these partners to have lawful rights to collect, use, and share your data before providing any data to us."

10. The Facebook Partner Medical Providers promise their patients/website users that they will protect the privacy of the patients' health information; that they will use and disclose their health information only for enumerated, permitted purposes, and that they will obtain the patient's/user's consent before disclosing their health information for

3

any non-enumerated purpose (Facebook Partner Medical Providers' Privacy Notices).[1] The Facebook Partner Medical Providers' Privacy Notices are substantively identical or very similar on these points, as they are largely dictated by law, including HIPAA.

11.     However, Facebook knowingly receives, and the Facebook Partner Medical Providers knowingly convey, patient data—including patient portal usage information— from hundreds of Facebook Partner Medical Providers in the United States that have deployed the Facebook Pixel on their web properties.

12.     On information and belief, at least 664 hospital systems or medical provider web properties convey patient data to Facebook via the Facebook Pixel.

13.     Despite knowingly receiving health-related information from Facebook Partner Medical Providers, Facebook has not taken any action to enforce or validate its requirement that Facebook Partner Medical Providers obtain adequate consent from patients before providing patient data to Facebook.

14.     Despite knowingly conveying health-related information to Facebook via the Facebook Pixel, the Facebook Partner Medical Providers have not obtained adequate consent from patients before providing patient data to Facebook.

15.     Facebook monetizes the information it receives through the Facebook Pixel deployed on medical providers' web properties by using it to generate highly-profitable targeted advertising on- and off-Facebook.

---

[1] *See, e.g.*, DukeHealth's Notice of Privacy Practices, located at:
https://www.dukehealth.org/sites/default/files/notice-privacy-brochure.pdf;
WakeMed's Notice of Privacy Practices, located at:
https://www.wakemed.org/assets/documents/regulatory/notice-of-privacy-english.pdf.

16.     The targeted advertising Facebook offers for sale includes the ability to target patients based on specific actions that a patient has taken on the Facebook Partner Medical Providers' websites.

17.     Facebook also offers the ability to engage in remarketing based on positive targeting – that is, serving specific ad campaigns to patients based on the specific actions those patients took on the Facebook Partner Medical Providers' websites. For example, Facebook could target ads to a patient who had (1) used the patient portal and (2) viewed a page about a specific condition, such as cancer.

18.     Facebook also offers Facebook Partner Medical Providers the ability to engage in remarketing based on negative targeting – that is, ensuring that ads are not shown to users who have taken specific action. This could mean that Facebook would exclude existing patients from a Facebook Partner Medical Provider's advertising campaign in order to establish new patients.

19.     Facebook employs thousands of account managers or representatives to help partners, including Facebook Partner Medical Providers, use the Facebook Pixel and other tools.

20.     Through its account managers and representatives, Facebook is aware that it is receiving patient data from hundreds of different Facebook Partner Medical Providers in the United States without patient knowledge, consent, or valid HIPAA authorizations.

21.     Facebook also utilizes "The Facebook Crawler" that scans pages of partner apps and websites and through which Facebook gathers information about the app or website, including its title and description.

22.     Through the Facebook Crawler, Facebook is aware that it is receiving patient data.

23.     Facebook has also been served subpoenas in other actions regarding disclosure of patient information through the Facebook Pixel.

24.     Facebook is also aware of every web property where the Facebook Pixel is deployed and Facebook is fully capable of conducting expert analysis to identify hospitals or medical provider properties where the Facebook Pixel is present.

25.     Facebook's actions described herein give rise to causes of action for: (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) intrusion upon seclusion / violation of Article I, section 1 of the California Constitution; (4) federal and state electronic communications privacy and wiretap claims; (5) the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632; (6) Negligent Misrepresentation; and (7) Violation of California's Unfair Competition Law.

26.     Facebook Partner Medical Providers are aware through their web developers and other IT professionals, and additional employees, that the Facebook Pixel is conveying protected patient data to Facebook.

27.     Facebook Partner Medical Providers' actions give rise to causes of action for (1) breach of contract; (2) intrusion upon seclusion/breach of privacy; (3) federal and state electronic communications privacy and wiretap claims; and (4) negligence; including negligence *per se*;

## II.    JURISDICTION AND VENUE

28.    This Court has personal jurisdiction over the Defendants because (1) Defendant Facebook has sufficient minimum contacts with this District in that it operates and markets its services throughout the country and in this District; and (2) Defendants Duke University Health System, Inc. and WakeMed have sufficient minimum contacts with this District and operate and market their services throughout the state and in this District. Additionally, Defendant Duke University Health System, Inc. is headquartered in this District.

29.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2510, *et seq.*, (the Electronic Communications Privacy Act). This Court further has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and a member of the Class is a citizen of a State different from any Defendant.

30.    This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

31.    Venue is proper in this district because Defendant Duke University Health System, Inc. is headquartered in this District and resides this this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District.

## III.    PARTIES TO THE LITIGATION

32.    Plaintiff Kim Naugle is a citizen of North Carolina, residing in Fuquay-Varina, North Carolina, a Facebook user, and a patient of Defendant WakeMed ("WakeMed") who used WakeMed's "MyChart" patient portal, currently located at https://mychart.wakemed.org/MyChart-PRD/Authentication/Login?, to view medical records, lab results, and otherwise communicate with her provider. Plaintiff's use of WakeMed's MyChart patient portal included the time during which the Facebook Pixel was secretly deployed on the portal login page.

33.    Plaintiff Afrika Williams is a citizen of North Carolina, residing in Morrisville, North Carolina, a Facebook user, and a patient of Defendant Duke University Health System, Inc. ("DukeHealth"), who used the "DukeMyChart" patient portal, currently located at https://www.dukemychart.org/home/Authentication/Login?%5Fga=2%2E45171425%2E430573737%2E1660242258%2D451756755%2E1660242258, to view medical records, lab results, and otherwise communicate with her provider. Plaintiff's use of DukeHealth's patient portals included the time during which the Facebook Pixel was secretly deployed on the portal login pages.

34.    Defendant Meta Platforms, Inc. (referred to herein by its previous name of "Facebook") is a publicly traded Delaware corporation headquartered in Menlo Park, California, and does business throughout the United States and the world, deriving substantial revenue from interstate commerce.

35.    Defendant DukeHealth is a not-for-profit health system organized under the laws of North Carolina and headquartered in Durham, North Carolina. Its DukeMyChart patient portal uses the Facebook Pixel, through which it conveyed Williams's patient status and health information to Facebook.

36.    Defendant WakeMed is a not-for-profit health system organized under the laws of North Carolina and headquartered in Raleigh, North Carolina.  Its MyChart patient portal uses the Facebook Pixel, through which it conveyed Naugle's patient status and health information to Facebook.

## IV.    FACTS COMMON TO ALL COUNTS

### A.    HEALTH PRIVACY LAWS IN THE UNITED STATES

37.    Patient health care information in the United States is protected by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations promulgated by the United States Department of Health and Human Services ("HHS").

38.    The HIPAA Privacy Rule establishes "national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as "protected health information" or "PHI") and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically. The Rule requires appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization. The Rule also gives individuals rights over their protected health information, including

rights to examine and obtain a copy of their health records, to direct a covered entity to transmit to a third party an electronic copy of their protected health information in an electronic health record, and to request corrections. The Privacy Rule is located at 45 CFR Part 160 and Subparts A and E of Part 164." https://www.hhs.gov/hipaa/for-professionals/privacy/index.html

39.    Under 45 C.F.R. § 164.502, a health care provider or business associate of a health care provider "may not use or disclose 'protected health information' except as permitted or required by" the HIPAA Privacy Rule.

40.    Under 45 C.F.R. 160.103, the Privacy Rule defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

41.    Under 45 C.F.R. § 160.103, the Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

42.    Under 45 C.F.R. § 164.514, the HIPAA de-identification rule states that "health information is not individually identifiable only if" (1) an expert "determines that

the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination,'" or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed: Names ... Medical record numbers; ... Account numbers ... Device identifiers and serial numbers; ... Web Universal Resource Locators (URLs); Internet Protocol (IP) address numbers; ... and any other unique identifying number, characteristic, or code." In addition, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

43.     Under 42 U.S.C. § 1320d-6, any "person [individual ... or a corporation] who knowingly and in violation of this part—(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual ... shall be punished" by fine or, in certain circumstances, imprisonment, with increased penalties for "intent to sell, transfer, or use individually identifiable health information for commercial advantage[.]" The statute further provides that a "person ... shall be considered to have obtained or disclosed individually identifiable health information ... if the information is maintained by a covered entity ... and the individual obtained or disclosed such information without authorization."

44.     Patient status alone is protected by HIPAA.

45.     Guidance from HHS instructs health care providers that patient status is protected by HIPAA. In <u>Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule</u>, HHS sets out:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. ... *If such information was listed with* health condition, *health care provision* or payment data, *such as an indication that the individual was treated at a certain clinic*, then this information would be PHI.[2]

46.     In its guidance for Marketing, HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. ... Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*.[3]

47.     HHS has previously instructed that HIPAA covers patient-status, i.e., the question whether an individual is a patient of a medical institution:

---

[2] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf at 5 (emphasis added).

[3] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf at 1-2 (emphasis added).

a.  "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b.  "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which would include disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

c.  It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

d.  The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

48.  There is no HIPAA-exception for the Internet or online patient portals.

### B.    FACEBOOK'S CONTRACTUAL PROMISES

49.    Every Facebook user is legally deemed to have agreed to the Terms, Data Policy, and Cookie Policy via a checkbox on the sign-up page; and the Terms, Data Policy, and Cookie

Policy are binding upon Facebook and its users.

50.    The Facebook Data Policy expressly provides that Facebook "requires" businesses that use the Facebook Pixel "to have lawful rights to collect, use, and share your data before providing any data to [Facebook]."

51.    But Facebook does not "require" medical providers to have lawful rights to share patient data associated with their respective patient portals and appointment software before sending it to Facebook.

52.    Instead, Facebook merely includes a provision in its form contract which creates an unenforced "honor system" for publishers, stating that, by using the Facebook Business Tools, the publisher "represent[s] and warrant[s] that [it has] provided robust and sufficient prominent notice to users regarding the Business Tool Data collection, sharing, and usage."

53.    In reality, Facebook does not actually verify that publishers have obtained adequate consent per the contract.[4]

54.    Instead, the Facebook Pixel is blindly made available to any willing publisher regardless of their privacy policies, consent processes, or the nature of their business.

---

[4] In contrast, Facebook requires publishers in the European Union to provide "all necessary consents" in a "verifiable manner."

14

55.     Facebook's contract with medical providers for use of the Facebook Pixel does not mention HIPAA at all.

56.     Facebook does not take any action to discourage medical providers from using the Facebook Pixel.

57.     Facebook actively encourages medical providers to use the Facebook Pixel for their marketing campaigns.

### C.     HOW THE FACEBOOK PIXEL WORKS

58.     Facebook operates the world's largest social media company.

59.     Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Facebook associates with personal identifiers including IP addresses, cookies, and device identifiers.

60.     Facebook also tracks non-users across the web through its widespread Internet marketing products and source code.

61.     Facebook's revenue is derived almost entirely from selling targeted advertising to Facebook users on Facebook.com and to all Internet users on non-Facebook sites that integrate Facebook marketing source code on their websites.

62.     Facebook Business is the division that provides advertising services to developers. Facebook Business and the advertising tools it provides to developers are focused on trade and commerce.

63.    The Facebook Pixel, a product for Facebook Business, is a "piece of code" that lets developers "measure, optimize and build audiences for ... ad campaigns."[5]

64.    The Facebook Pixel is an invisible 1x1 web bug that Facebook makes available to web-developers to help track ad-driven activity from Facebook and others on their website.

65.    Key features of the Facebook Pixel include its ability to help developers:

a.    "Measure cross-device conversions" and "understand how your cross-device ads help influence conversion";

b.    "Optimize delivery to people likely to take action" and "ensure your ads are shown to the people most likely to take action"; and

c.    "Create custom audience from website visitors" and create "dynamic ads [to] help you automatically show website visitors the products they viewed on your website – or related ones."

66.    Facebook describes the Facebook Pixel as "a snippet of Javascript code" that "relies on Facebook cookies, which enable [Facebook] to match ... website visitors to their respective Facebook User accounts."

67.    Facebook further explains "How the Facebook Pixel Works":[6]

When someone visits your website and takes an action (for example, buying something), the Facebook pixel is triggered and reports this action. This way, you'll know when a customer took an action after seeing your Facebook ad. You'll also be able to reach this customer again by using a custom audience. When more and more conversions happen on your

---

[5] https://www.facebook.com/business/learn/facebook-ads-pixel

[6] https://www.facebook.com/business/learn/facebook-ads-pixel

website, Facebook gets better at delivering your ads to people who are more likely to take certain actions. This is called conversion optimization.

*Id.*

68.    Facebook provides simple instructions for developers about "Setting up the

Facebook Pixel":

If you have access to your website's code, you can add the Facebook pixel yourself. Simply place the Facebook pixel base code (what you see when you create your pixel) on all pages of your website. Then add standard events to the pixel code on all special pages of your website, such as your add-to-cart page or your purchase page. For full step-by-step instructions or adding the Facebook pixel to your site, visit the Help Center.

Many people need the help of a developer to complete this step. If that's the case, simply email your Facebook pixel code to them, and they can easily add it to your site.

Create your Facebook pixel to send to your developer, or install it yourself.

Go to Ads Manager

69.    Facebook creates the Facebook code for each developer who installs it.

70.    Facebook recommends that the Pixel code be placed early in the source code

for any given webpage or website to ensure that the user will be tracked:

Installing The Pixel

To install the pixel, we highly recommend that you add its base code between the opening and closing <head> tags on every page where you will be tracking website visitor actions. Most developers add it to their website's persistent header, so it can be used on all pages.

Placing the code within your <head> tags reduces the chances of browsers or third-party code blocking the pixel's execution.

It also executes the code sooner, increasing the chance that
your visitors are tracked before they leave your page.

71.     By executing the code sooner, Facebook has designed the Pixel such that
Facebook receives the information about patient actions on the medical provider's
properties contemporaneous with their making.

72.     As soon as a patient takes any action on a webpage which includes the
Facebook Pixel—such as clicking a button to register, login, or logout of a patient portal
or to create an appointment—Facebook's source code commands the patient's computing
device to re-direct the content of the patient's communication to Facebook while the
exchange of the communication between the patient and the medical provider is still
occurring.

73.     By design, Facebook receives the content of a patient's patient portal sign-in
communication immediately *after* the patient clicks the log-in button and *before* the
medical provider receives it.

74.     In all cases, the content of the patient's portal and appointment
communications are re-directed to Facebook while the communications are still occurring.

75.     The cookies by which Facebook identifies patients include, but are not
necessarily limited to, cookies named: c_user, datr, fr, and _fbp.

76.     The c_user cookie is a means of identification for Facebook users. The c_user
cookie value is the Facebook equivalent of a user identification number. Each Facebook
user account has one – and only one – unique c_user cookie. Facebook uses the c_user
cookie to record user activities and communications.

18

77.    A skilled computer user can obtain the c_user cookie value for any Facebook user by (1) going to the user's Facebook page, (2) right-clicking on their mouse, (3) selecting 'View page source,' (4) executing a control-F function for "fb://profile," and (5) copying the number value that appears after "fb://profile" in the page source code of the target Facebook user's page.

78.    It is even easier to find the Facebook account associated with a c_user cookie: one simply needs to log-in to Facebook, and then type www.facebook.com/#, with # representing the c_user cookie identifier. For example, the c_user cookie value for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

79.    The Facebook datr cookie identifies the patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users.

80.    Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

81.    Any Facebook user can view the specific datr cookie identifiers that Facebook has associated with their account by using the Facebook Download Your Information tool.

82.     The Facebook fr cookie is an encrypted combination of the c_user and datr cookies.[7]

83.     The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendants' use of the Facebook Pixel. The _fbp cookie is a Facebook cookie that masquerades as a first-party cookie to evade third party cookie blockers and share data more directly between a medical provider and Facebook.

84.     The medical provider or its developer then simply copy-pastes the Facebook Pixel code that Facebook creates and provides into the medical provider's web-property.

85.     Facebook expressly admits that the Pixel "log[s] when someone takes an action" such as "adding an item to their shopping cart or making a purchase."

> Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website. Examples of actions include adding an item to their shopping cart or making a purchase. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. You'll also have options to reach those customers again through future Facebook ads.

86.     For medical providers, the actions that the Facebook Pixel logs include:

a.     When a patient clicks to register for the patient portal;

b.     When a patient clicks to log-in to the patient portal;

c.     When a patient clicks to logout of the patient portal;

d.     When a patient sets up an appointment;

---

[7] *See* Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission, Mar. 27, 2015, available at
https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

e.     When a patient clicks a button to call the provider; and

f.     The specific communications a patient exchanges at the provider's property, including those relating to specific providers, conditions, and treatments and the timing of such actions, including whether they are made while a patient is still logged-in to a patient portal or around the same time that the patient has scheduled an appointment, called the medical provider, or logged in or out of the patient portal.

**D.     FACEBOOK PUBLICLY ACKNOWLEDGES THAT HEALTH-BASED ADVERTISING IS INAPPROPRIATE**

87.     Facebook has publicly acknowledged that targeted advertising based on health information is not appropriate.

88.     On November 9, 2021, Facebook announced that it was removing the ability to target users on "topics people may perceive as sensitive, such as options referencing causes, organizations, or public figures that relate to health[.]"[8]

89.     Facebook's announcement was a public relations success:

a.     Reuters published a story headlined "Facebook plans to remove thousands of sensitive ad-targeting options" and led the story with a sentence about Facebook's "plans to remove detailed ad-targeting

---

[8] https://www.facebook.com/business/news/removing-certain-ad-targeting-options-and-expanding-our-ad-controls

options that refer to 'sensitive' topics, such as ads based on interactions with content around ... health[.]"[9]

b.    The New York Times published a similar story with a similar headline, "Meta plans to remove thousands of sensitive ad-targeting categories: Ad buyers will no long be able to use topics such as health ... to target people[.]"[10]

c.    Many more, similar, articles were published, giving Facebook's users the misimpression that Facebook would not allow targeting based on health.

90.    But Facebook did not change the most insidious types of targeting based on health: those marketing campaigns from medical providers that disclose patient identities and their individually identifiable health information to Facebook for the purpose of targeted marketing based on their communications with their medical providers.

91.    Facebook clarified that the change was limited to "people's interactions with content" on the Facebook "platform."

92.    Facebook then informed advertisers that they could still use "website custom audiences and lookalike" to "help reach people who have already engaged with a business or group's website or products." In the case of medical providers, the "people who have already engaged" are patients.

---

[9] https://www.reuters.com/technology/facebook-removes-target-options-advertisers-some-topics-2021-11-09/

[10] https://www.nytimes.com/2021/11/09/technology/meta-facebook-ad-targeting.html

### E.    FACEBOOK CHANGED ITS CONTRACTUAL PRIVACY PROMISES IN 2018

93.    Prior to April 2018, Facebook's contract did not "require" partners to have the lawful rights to share user data before doing so.

94.    Upon information and belief, Facebook changed its contract with users on or about April 19, 2018, which added a clause stating: "We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us."

95.    The following is a side-by-side comparison of the pre- and post-April 2018 contract provisions:

| Before April 19, 2018 | After April 19, 2018 |
|---|---|
| **Information from websites and apps that use our Services.** We collect information when you visit or use third-party websites and apps that use our Services (like when they offer our Like button or Facebook Log In or use our measurement and advertising services). This includes information about the websites and apps you visit, your use of our Services on those websites and apps, as well as information the developer or publisher of the app or website provides to you or us.<br><br>**Information from third-party partners.** We receive information about you and your activities on and off Facebook from third-party partners, such as information from a partner when we jointly offer services or from an advertiser about your experiences or interactions with them. | **Information from partners.** Advertisers, app developers, and publishers can send us information through Meta Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel. These partners provide information about your activities off of our Products—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have an account or are logged into our Products. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information.<br><br>Partners receive your data when you visit or use their services or through third parties |

|  | they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us. Learn more about the types of partners we receive data from.<br><br>To learn more about how we use cookies in connection with Meta Business Tools, review the Facebook Cookies Policy and Instagram Cookies Policy. |
| --- | --- |

### F.    FACEBOOK PARTNER MEDICAL PROVIDERS' CONTRACTUAL PROMISES

96.    The Facebook Partner Medical Providers make substantively identical or extremely similar promises in their Privacy Notices, including promises that they will protect the privacy of their patients' health information; that they will use and disclose their health information only for enumerated, permitted purposes, and that they will obtain the patient's consent before disclosing their health information for any non-enumerated purpose.

## V.    CLASS ACTION ALLEGATIONS

### A. PLAINTIFF CLASS ALLEGATIONS

97.    Plaintiffs file this as a class action on behalf of themselves and the following class pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3):

> All Facebook users who are current or former patients of medical providers in the United States with web properties through which Facebook acquired patient communications relating to medical provider patient portals, appointments, phone calls, and communications associated with patient portal users, for which neither the medical provider nor Facebook obtained a HIPAA, or any other valid, consent.

24

98.    Where appropriate, the above-defined class is referred to as the "Plaintiff Class."

99.    Excluded from the Plaintiff Class are the Court and its personnel and the Defendants and their officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest.

100.    Plaintiffs reserve the right to amend the class definitions, including creating subclasses as necessary, after having had an opportunity to conduct discovery

101.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

102.    **Numerosity.** Consistent with Fed. R. Civ. P. 23(a)(1), the members of the Plaintiff Class are so numerous that joinder is impracticable.  While the exact number of Class Members is unknown to Plaintiffs at this time, the proposed Class includes at least tens of thousands of individuals who may be identified through objective means.

103.    **Commonality and Predominance.** Consistent with Fed. R. Civ. P. 23(a)(2) and 23(b)(3), common questions of law and fact are apt to drive resolution of the case, exist as to all members of the Plaintiff Class and predominate over any questions affecting solely individual members of the Plaintiff Class including, but not limited to, the following:

a.    Whether the Facebook Pixel is designed to send individually identifiable information to Facebook;

25

b.      Whether the Defendants' Terms and Privacy Notices are valid contracts;

c.      Whether Facebook failed to require Facebook Partner Medical Providers to have lawful rights to share patient data with Facebook before deploying the Facebook Pixel;

d.      Whether Facebook acquired the content of patient communications;

e.      Whether the Plaintiff Class provided Defendants with authorization for Facebook to acquire their communications with their medical providers, including through the patient portal, appointment forms, and phone calls;

f.      Whether the Facebook Pixel's presence and use on Facebook Partner Medical Provider websites where it discloses actions that patients take relating to patient portals, appointments, and phone calls to their Facebook Partner Medical Providers is highly offensive;

g.      Whether Facebook's acquisition of the content of communications between patients and their Facebook Partner Medical Providers occurred contemporaneous to their making;

h.      Whether Defendants breached their contracts with users;

i.      Whether the information at issue has economic value; and

j.      Whether Defendants unjustly profited from their conveyance and collection of patient portal, appointment, and phone call information.

104.    **Typicality.** Consistent with Fed. R. Civ. P. 23(a)(3), the named Plaintiffs' claims are typical of the claims of other Plaintiff Class Members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal and state law, as complained of herein.

105.    **Adequacy.** Consistent with Fed. R. Civ. P. 23(a)(4), the named Plaintiffs will fairly and adequately protect the interests of the members of the Plaintiff Class and have retained counsel that is competent and experienced in class action litigation. The named Plaintiffs have no interests that conflict with, or are otherwise antagonistic to, the interests of, other Plaintiff Class Members.

106.    **Superiority.** Consistent with Fed. R. Civ. P. 23(b)(3), a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Plaintiff Class Members is impracticable. Further, as the damages that individual Plaintiff Class Members have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Plaintiff Class to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

107.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3), because the common questions of law and fact predominate over any questions affecting individual Class Members, a class action is superior to other available methods for the fair and efficient adjudication of this controversy, and the requirements of Rule 23(a) are met.

### B.  DEFENDANT CLASS ALLEGATIONS

108.    Plaintiffs also bring a portion of this action as a defendant class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1)(A) and (B) against a class consisting of Defendant health care institutions that deployed the Facebook Pixel on their web properties ("Defendant Medical Providers Class" or "Defendant Class").

109.    The members of the Defendant Medical Provider Class are so numerous that joinder of all members is impracticable.    Upon information and belief, there are approximately 664 members of the Defendant Class.

110.    There are questions of law and fact that are common to the Defendant Class. These questions include, but are not limited to:

(1) whether their Privacy Notices constitute contracts with their patients/users;

(2) whether their use of the Facebook Pixel and resulting conveyance of patient status and health information to Facebook violated those contracts;

(3) whether their conveyance of patient status and health information to Facebook constitutes an invasion of privacy/intrusion upon seclusion;

(4) whether their conveyance of patient status and health information to Facebook damaged Plaintiffs and the members of the Plaintiff Class;

(5) whether their conveyance of patient status and health information to Facebook and resultant damage to their patients constitutes negligence;

(6) whether their conveyance of patient status and health information to Facebook violates HIPAA, the ECPA, or other federal or state statutes;

(7) whether such violations of HIPAA, the ECPA, or other federal or state statutes constitutes negligence *per se*;

28

(8) whether their conveyance of patient status and health information to Facebook constitutes a privacy violation that supports Article III standing.

111.    The named individual medical provider defendants above should be appointed, without cost to the class, as representatives of the Defendant Medical Provider Class (the "Defendant Class Representatives").

112.    The claims against and anticipated defenses of the Defendant Class Representatives are typical of the claims against and anticipated defenses of the unnamed members of the Defendant Class.  Like the Defendant Class Representatives, each of the unnamed members of the Defendant Class voluntarily deployed the Facebook Pixel on their web properties resulting in the wrongful, contemporaneous, re-direction to Facebook of patient communications to register as a patient, sign-in or out of a supposedly "secure" patient portal, request or set appointments, or call their provider via their computing device. The nature of the defenses that may be asserted by the Defendant Class Representative also would be the same, as liability for disclosure of patient status and health information does not depend on the personal circumstances of the particular Defendant Class Members.

113.    The Defendant Class Representatives will be adequate and appropriate representatives of the Defendant Class in the course of and by virtue of their own defenses to the same claims.  Because they have as strong an incentive to vigorously defend against the Plaintiff Class's claims as any unnamed Defendant Class Member, these Defendant Class Representatives will fairly and adequately protect and represent the interests of the unnamed members of the Defendant Class.

114.    Prosecuting separate actions against individual Defendant Class Members would create a risk of inconsistent judgments with respect to individual class members.  If multiple actions against Facebook Partner Medical Providers resulted in, for example, different determinations to the common questions enumerated above, among others, then that would establish incompatible standards for Plaintiffs in seeking relief from Defendant Meta and the Defendant Medical Provider Class.

115.    Further, as a practical matter, the cost and difficulty of defending against separate suits following the adjudication of the common questions of fact and law related to the Facebook Partner Medical Provider Class's use of the Facebook Pixel on their web properties would be dispositive of or substantially impair the interests of the unnamed Defendant Class Members.

## VI.    TOLLING

116.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Plaintiff Class were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

117.    Plaintiffs and members of the Plaintiff Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were acting unlawfully and in the manner alleged herein. As alleged herein, the representations made by Defendants were material to Plaintiffs and members of the Plaintiff Class at all relevant times. Within the time period of any applicable statutes of

limitations, Plaintiffs and members of the Plaintiff Class could not have discovered through the exercise of reasonable diligence the alleged wrongful conduct.

118.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Plaintiff Class the true nature of the disclosures being made and the lack of an actual "requirement" before the data was shared with Facebook.

119.    Defendants knowingly, actively, affirmatively and/or negligently concealed the facts alleged herein. Plaintiffs and members of the Plaintiff Class reasonably relied on Defendants' concealment.

120.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
**(Against All Defendants and the Defendant Medical Providers' Class)**

121.    Plaintiffs hereby incorporate all prior paragraphs as if fully stated herein.

122.    Facebook requires users to click a box indicating that, "By clicking Sign Up, you agree to our Terms, Data Policy and Cookies Policy."

123.    "Click-wrap agreements" such as those at issue herein are valid and binding contracts.

124.    The Facebook Terms are binding on Facebook and its users.

125.    The Facebook Data Policy is binding on Facebook and its users.

126.    The Facebook Cookies Policy is binding on Facebook and its users.

31

127. The Facebook Data Policy promises users that Facebook "requires each of [Facebook's] partners to have lawful rights to collect, use and share your data before providing any data to [Facebook]."

128. Facebook breached this contractual promise, as described in detail above, by not requiring its Facebook Partner Medical Providers to obtain patient consent before sharing patient status and other data relating to online patient portal registration, logins, and logouts as well as appointment information with Facebook through the Facebook Pixel and through other means.

129. The Defendant Medical Providers promise in their Privacy Policies that they will protect the privacy of their patients' health information; that they will use and disclose their health information only for enumerated, permitted purposes, and that they will obtain the patient's consent before disclosing their health information for any non-enumerated purpose.

130. The Defendant Medical Providers breached these contractual promises when they conveyed patient status and health information to Facebook via the Facebook Pixel without obtaining their patients' consent.

131. In addition to the express contract provisions set forth above, implied contracts existed between Defendants and Plaintiffs that Defendants would not conspire with others to violate Plaintiffs' legal rights to privacy in their individually identifiable health information.

132. Plaintiffs are Facebook account holders who used Defendant Medical Providers' patient portals and/or appointment-related functionality of their medical

providers' respective web-properties through which Facebook obtained their individually identifiable health information.

133.    Plaintiffs used the Defendant Medical Providers' patient portals by signing in and out of the portal to access medical records, lab results, and otherwise to communicate with their providers.

134.    The patient health information that Defendant Medical Providers conveyed and that Facebook obtained in breach of their contracts with Plaintiffs included:

  a.    Patient identifiers including, but not limited to, email addresses, IP addresses, persistent cookie identifiers, device identifiers, and browser fingerprint information;

  b.    the data and time of patient registrations for their Defendant Medical Providers' patient portals;

  c.    log-in and logout times for their Defendant Medical Providers' patient portals;

  d.    the contents of communications that patients exchange inside their Defendant Medical Providers' patient portals immediately before logging out of those portals;

  e.    the contents of communications relating to appointments that patients made with their Defendant Medical Providers; and

  f.    the user's status as a patient of their Defendant Medical Providers.

135.    Defendants' breaches caused Plaintiffs and Plaintiff Class Members the following damages:

a.      Nominal damages for breach of contract;

b.      General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c.      Sensitive and confidential information including patient status and appointments that Plaintiffs and Plaintiff Class Members intended to remain private are no longer private;

d.      Defendants eroded the essential confidential nature of the patient-provider relationship;

e.      Defendants took something of value from Plaintiffs and Plaintiff Class Members and derived benefits therefrom without Plaintiffs' and Plaintiff Class Members' knowledge or informed consent and without sharing the benefit of such value;

f.      Benefit of the bargain damages in that Defendants' contracts stated that payment for their services would consist of a more limited set of collection of personal information than that which Defendants actually charged.

## SECOND CAUSE OF ACTION
## GOOD FAITH AND FAIR DEALING
### (Against Defendant Facebook)

136.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

137.    A valid contract exists between Plaintiffs and Facebook.

138.    The contract specifies that California law governs the parties' relationship.

139.    Facebook prevented Plaintiffs and Plaintiff Class Members from receiving the full benefit of the contract by intercepting the content of protected individually identifiable health information exchanged with medical providers.

140.    By doing so, Facebook abused its power to define terms of the contract, specifically the meaning of the term "require" in Facebook's promise that it would "require" partners to have lawful rights to share users' data with Facebook before doing so and then taking no action (and actually encouraging) medical providers to share protected health information without valid patient authorization.

141.    By doing so, Facebook did not act fairly and in good faith.

142.    Facebook's breach caused Plaintiffs and Plaintiff Class Members the following damages:

    a.    Nominal damages for breach of contract;

    b.    General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

    c.    Sensitive and confidential information including patient status and appointments that Plaintiffs and Plaintiff Class Members intended to remain private are no longer private;

    d.    Facebook eroded the essential confidential nature of the patient-provider relationship;

    e.    Facebook took something of value from Plaintiffs and Plaintiff Class Members and derived benefits therefrom without Plaintiffs' and

Plaintiff Class Members' knowledge or informed consent and without

sharing the benefit of such value; and

f.    Benefit of the bargain damages in that Facebook's contract stated that

payment for the service would consist of a more limited set of

collection of personal information than that which Facebook actually

charged.

## THIRD CAUSE OF ACTION
## INTRUSION UPON SECLUSION—CONSTITUTIONAL INVASION OF PRIVACY
### (Against All Defendants and the Defendant Medical Providers' Class)

143.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

144.    Article I, section 1 of the California Constitution provides:

> *All people* are by nature free and independent and *have inalienable rights. Among these are* enjoying and defending life and liberty, acquiring, possessing, and protecting property, and *pursuing and obtaining* safety, happiness, and *privacy.*

Cal. Const. art. I, § 1 (emphasis added).

145.    Plaintiffs had no knowledge and did not consent or authorize Defendant

Medical Providers to convey or Defendant Facebook to obtain the content of their

communications with their medical providers as described herein.

146.    Plaintiffs enjoyed objectively reasonable expectations of privacy

surrounding communications with their Defendant Medical Providers relating to the

respective patient portals and appointments based on:

a.    The Defendant Medical Providers status as their health care providers and the reasonable expectations of privacy that attach to such relationships;

b.    HIPAA;

c.    the Electronic Communications Privacy Act; and

d.    Facebook's promise that it would "require" partners to have lawful permission to share their data before Facebook would collect it;

e.    The Defendant Medical Providers' promises to keep their patient status and health information private.

147.  Plaintiffs' claims are based on the following private facts:

a.    that Plaintiffs are patients of the various medical providers;

b.    The specific dates and times Plaintiffs clicked to log-in or log-out of the various medical providers' patient portals;

c.    The specific and detailed communications exchanged while logged-in to a patient portal; and

d.    The specific dates and times where Plaintiffs requested appointments and from which doctor's or practice group pages such appointments were requested.

148.   Defendants' conduct was intentional and intruded on Plaintiffs' and Plaintiff Class Members' medical communications which constitute private conversations, matters, and data.

149.    The Defendant Class's conduct in conveying and Defendant Facebook's conduct in acquiring patient portal and appointment communications would be highly offensive to a reasonable person because:

a.    Defendants conspired to violate a cardinal rule of the provider-patient relationship;

b.    Defendants' conduct violated federal law designed to protect patient privacy;

c.    Defendants' conduct violated the ECPA; and

d.    Defendants' conduct violated the express promises they made to users.

150.    Defendants' breaches caused Plaintiffs and Plaintiff Class Members the following damages:

a.    Nominal damages for breach of contract;

b.    General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c.    Sensitive and confidential information including patient status and appointments that Plaintiffs and Plaintiff Class Members intended to remain private are no longer private;

d.    Defendants eroded the essential confidential nature of the patient-provider relationship;

e.    Defendants took something of value from Plaintiffs and Plaintiff Class Members and derived benefits therefrom without Plaintiffs' and

Plaintiff Class Members' knowledge or informed consent and without

sharing the benefit of such value; and

f.     Benefit of the bargain damages in that Defendants' contracts stated

that payment for their services would consist of a more limited set of

collection of personal information than that which Facebook actually

charged.

<div align="center">

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**(Against All Defendants and Defendant Medical Providers' Class)**

</div>

151.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

152.    The Electronic Communications Privacy Act ("ECPA") prohibits the

intentional interception of the contents of any electronic communication. 18 U.S.C. § 2511.

153.    The ECPA protects both the sending and receipt of communications.

154.    18 U.S.C. § 2520(a) provides a private right of action to any person whose

electronic communications are intercepted.

155.    Facebook intentionally intercepted, and Defendant Medical Providers sent to

Facebook, the electronic communications that Plaintiffs exchanged with their respective

Defendant Medical Providers on the providers' web properties where the Facebook Pixel

was present.

156.    The transmissions of data between Plaintiffs and their medical providers

qualify as communications under the ECPA's definition in 18 U.S.C. § 2510(12).

157.    The Defendant Medical Providers sent, and Defendant Facebook acquired, Plaintiffs' and the Plaintiff Class Members' patient communications with their medical providers as alleged herein contemporaneous with their making.

158.    The intercepted communications include:

    a.    the content of patient registrations for various patient portals, including clicks on buttons to "Register" or "Signup" for said portals;

    b.    the content patient log-in and logout of the various patient portals, including clicks to "Sign-in," "Log-in," "Sign-out," or "Log-out."

    c.    the contents of communications that patients exchange inside various patient portals immediately before logging out of those portals; and

    d.    the contents of communications relating to appointments with medical providers.

159.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.    The cookies Facebook used to track patients' communications;

    b.    The patients' browsers;

    c.    The patients' computing devices;

    d.    Facebook's web-servers;

    e.    The web-servers of the Defendant Medical Providers' web properties where the Facebook Pixel was present; and

    f.    The Facebook Pixel source code deployed by Defendants to effectuate the sending and acquisition of patient communications.

160.    Facebook is not a party to patient communications with their medical providers.

161.    The Defendant Medical Providers sent to Facebook, and Facebook received, the content of patient communications through the surreptitious redirection of them from the patients' computing devices to Facebook.

162.    Patients did not consent to the Defendant Medical Providers sending, or to Facebook's acquisition of, their patient portal, appointment, and phone call communications with their Defendant Medical Providers.

163.    Neither Facebook nor the Defendant Medical Providers obtained legal authorization to obtain or convey patient communications with their medical providers relating to patient portals, appointments, and phone calls.

164.    Facebook did not require any Defendant Medical Providers to obtain, and the Defendant Medical Providers did not obtain, the lawful rights to share the content of patient communications relating to patient portals, appointments, and phone calls.

165.    Any purported consent that Facebook received from Defendant Medical Providers to obtain patient communications content was not valid.

166.    In sending and in acquiring the content of patient communications relating to patient portals, appointments, and phone calls, Defendants had a purpose that was tortious, criminal, and designed to violate federal and state legal and constitutional provisions including:

> a.    A knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person;

b.    A violation of 42 U.S.C. § 1320d-6, which is a criminal offensive punishable by fine or imprisonment;

c.    Violation of state unfair business practice statutes;

d.    Violation of HIPAA; and

e.    Violation of Article I, section 1 of the California Constitution.

167.    Defendants knew that such conduct would be highly offensive, as evidenced by Facebook's announcement in April 2018, that it would no longer allow advertising targeted based on health yet continued to use the Facebook Pixel on Defendant Medical Providers' properties for that purpose.

**FIFTH CAUSE OF ACTION**
**THE CALIFORNIA INVASION OF PRIVACY ACT**
**(Cal. Penal Code §§ 631 and 632)**
**(Against Defendant Facebook)**

168.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

169.    The California Invasion of Privacy Act (CIPA) is codified at Cal. Penal Code §§ 630-638. The Act begins with its statement of purpose: "The legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

170.    Cal. Penal Code § 631(a) provides, in pertinent part: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner .... willfully and

without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars."

171.    Cal. Penal Code § 632 provides, in pertinent part, that it is unlawful for any person "intentionally and without the consent of all parties to a confidential communication," to "use[] [a] recording device to ... record the confidential communication." As used in the statute, a "confidential communication" is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desired it to be confined to the parties thereto[.]"

172.    Facebook is a "person" within the meaning of CIPA §§ 631 and 632.

173.    Facebook did not have the consent of all parties to learn the contents of or record the confidential communications at issue.

174.    Facebook is headquartered in California, designed and contrived and effectuated its scheme to track patient communication at issue here from California, and has adopted California substantive law to govern its relationship with users.

175.    At all relevant times, Facebook's conduct alleged herein was without the authorization and consent of the Plaintiffs and Plaintiff Class Members.

176.    Facebook's actions were designed to learn or attempt to learn the meaning of the patient portal and appointment communications patients exchanged with their medical providers.

177.    Facebook's learning of or attempt to learn the contents of patient communications

occurred while they were in transit or in the process of being sent or received.

<u>SIXTH CAUSE OF ACTION</u>
**NEGLIGENT MISREPRESENTATION**
**(Against All Defendants and the Defendant Medical Providers' Class)**

178.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

179.    Facebook represented to Plaintiffs and the Plaintiff Class Members that a fact was true, namely, that before receiving the confidential information at issue, Facebook "requires" businesses "to have lawful rights to collect, use, and share [Plaintiffs' and Plaintiff Class Members'] data before providing any data" to Facebook.

180.    Defendant Medical Providers represented to Plaintiffs and Plaintiff Class Members Class that a fact was true, namely that they would not disclose the confidential information at issue for any reason or use not specifically listed in their Privacy Policies without obtaining Plaintiffs' and Plaintiff Class Members' consents.

181.    Defendants' representations were not true.

182.    Although Defendants may have honestly believed that their representations were true, Defendants had no reasonable grounds for believing their representations were true when they were made.

44

183.    Defendants intended that Plaintiffs and Plaintiff Class Members rely on their representations.

184.    Plaintiffs and Plaintiff Class Members reasonably relied on Defendants' representations.

185.    Plaintiffs and Plaintiff Class Members were harmed as set forth above.

186.    Plaintiffs and Plaintiff Class Members' reliance on Defendants' representations was a substantial factor in causing the harm.

## SEVENTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
**(Cal. Bus. & Prof. Code §§ 17200, *et seq*.)**
**(Against Defendant Facebook)**

187.    Plaintiffs hereby incorporate all other paragraphs as if fully stated herein.

188.    California Business and Professions Code section 17200 ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . .."

189.    Facebook has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

190.    Defendant has engaged in unlawful acts or practices under section 17200 by its violations of the California Constitution's right to privacy, ECPA and California Penal Code sections 631 and 632, through the acts and practices set forth in this Complaint.

191.    Defendant has engaged in fraudulent business acts or practices under section 17200 because its misrepresentations and omissions regarding its requirement that businesses have lawful rights to collect, use, and share Plaintiffs' and Plaintiff Class

45

Members' data before providing any data to Defendant, and Defendant's receipt of the confidential information at issue, were intended to, were likely to, and did deceive reasonable consumers such as Plaintiffs and the Plaintiff Class. The information Defendant misrepresented and concealed would be, and is, material to reasonable consumers because Defendant does not require businesses to have lawful rights to collect, use, and share Plaintiffs' and Plaintiff Class Members' data before providing any data to Defendant and Defendant receives the confidential information at issue nonetheless.

192.    Defendant has engaged in unfair acts and practices under section 17200 based on the acts and practices alleged herein, namely, that Defendant claims that it requires businesses to "have lawful rights to collect, use, and share [Plaintiffs' and Plaintiff Class Members'] data before providing any data" to Defendant, but in reality knows (or should have known) that the Facebook Pixel is being improperly used on hospital websites resulting in the wrongful, contemporaneous, redirection to Facebook of patient communications without the knowledge or authorization of Plaintiffs or Plaintiff Class Members.

193.    Defendant's actions offend public policy.

194.    Defendant's conduct, misrepresentations and omissions have also impaired competition within the health care market in that those actions have prevented Plaintiffs and Plaintiff Class Members from making fully informed decisions about whether to communicate online with their healthcare providers and to use their healthcare providers' websites in the first instance.

195.    Plaintiffs and Plaintiff Class Members have suffered an injury in fact, including the loss of money and/or property, as a result of Defendant's unfair, unlawful and/or deceptive practices, to wit, the disclosure of their personally identifiable data which has value as is demonstrated by the use and sale of it by Defendant. While only an identifiable "trifle" of injury is needed to be shown, as set forth above Plaintiffs, the Plaintiff Class Members, patients, and the public at large value their private health information at more than a trifle. And sale of this confidential and valuable information to has now diminished the value of such information to Plaintiffs and the Plaintiff Class.

196.    Defendant's actions caused damage to and loss of Plaintiffs', Plaintiff Class Members' and other patients' property right to control the dissemination and use of their personally identifiable patient data and communications.

197.    Defendant's actions caused damage to and loss of Plaintiffs', Plaintiff Class Members' and other patients' property rights to control the dissemination and use of the personally identifiable communications.

198.    Defendant's representation that it requires businesses to "have lawful rights to collect, use, and share [Plaintiffs' and Plaintiff Class Members'] data before providing any data" to Defendant was untrue. Again, had Plaintiffs and Plaintiff Class Members known these facts, they would not have used their health care provider's website.

199.    The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, in the State of California.

200.    Plaintiffs and the Plaintiff Class request that this Court enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Plaintiff Class, in the form of restitution, any money Defendant acquired through its unfair competition.

<div align="center">

**EIGHTH CAUSE OF ACTION**
**NEGLIGENCE and NEGLIGENCE per se**
**(Against Defendant Medical Providers and the Defendant Class)**

</div>

201.    Plaintiffs incorporate all previous paragraphs as if fully set forth below.

202.    Plaintiffs and Plaintiff Class Members entrusted their protected health information to Defendant Medical Providers, who owed them a duty to exercise reasonable care in handling and using the PHI in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from being conveyed to Facebook, and to promptly detect that it was being conveyed to Facebook without Plaintiffs' and the Plaintiff Class Members' consent.

203.    It was foreseeable to Defendant Medical Providers that incorporation of the Facebook Pixel onto their patient portals and web properties would result in the compromise of Plaintiffs' and the Plaintiff Class's protected health information by conveying it to Facebook.  By installing the Facebook Pixel onto their patient portals and web properties, the members of the Defendant Class acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Plaintiffs' Class Members' PHI.

204.    In addition, Defendant Medical Providers and Defendant Class Members had a duty to employ reasonable security measures under Section 5 of the Federal Trade

Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

205.    Defendant Medical Providers and the Defendant Class Members also had a duty to notify Plaintiffs and the Plaintiff Class Members within a reasonable timeframe of any breach to the security of their PHI.  This duty is required and necessary for Plaintiff and Plaintiff Class Members to take appropriate measures to protect their PHI, to be vigilant in the fact of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Defendant Class's conveyance of their PHI to Facebook.

206.    Defendant Medical Providers owed these duties to Plaintiffs and Plaintiff Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom the Defendant Class knew or should have known would suffer injury-in-fact from the Defendant Medical Providers' conveyance of Plaintiffs' PHI to Facebook via the Facebook Pixel.  The Defendant Class actively sought and obtained Plaintiffs' and the Plaintiff Class's PHI via their patient portals and other web properties.

207.    The risk that Facebook would try to gain access to the PHI and misuse it was foreseeable.  Given that the Defendant Class holds vast amounts of PHI, and Facebook has sought access to that PHI and used it for advertising purposes in the past, as it has admitted, the Defendant Class was on notice of the need to protect Plaintiffs' and the Plaintiff Class's PHI from Facebook.

208.    PHI is highly valuable, and the Defendant Medical Providers knew or should have known the risks in obtaining, using, handling, and storing, the PHI of Plaintiffs and Plaintiff Class Members, and the importance in exercising reasonable care in handling it.

209.    The Defendant Medical Providers and the Defendant Class breached their duties by filing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in their handling and securing of the PHI of Plaintiffs and Plaintiff Class Members, and in conveying that PHI to Facebook via the Facebook Pixel, which actually and proximately caused injuries to the Plaintiffs and the Plaintiff Class.

210.    The Defendant Medical Providers and the Defendant Class also breached their duties by failing to provide reasonably timely notice to the Plaintiffs and the Plaintiff Class Members of their conveyance of their PHI to Facebook, which actually and proximately caused injuries to the Plaintiffs and the Plaintiff Class.

211.    As a direct and traceable result of Defendants' negligence or negligent supervision, Plaintiffs and Plaintiff Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

212.    Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiffs' and Plaintiff Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the improper disclosure of their PHI, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate this improper disclosure that resulted from

and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

213.    Defendants' statutory violations of the FTC Act, HIPAA, the ECPA and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

214.    But for Defendants' wrongful and negligent breach of its duties owed to Plaintiff and Plaintiff Class Members, Plaintiff and Plaintiff Class Members would not have been injured.  These injuries were the reasonably foreseeable result of Defendants' breach of their duties.  Defendants knew or should have known that they were failing to meet their duties and that their breach would cause Plaintiffs and Plaintiff Class Members to suffer the foreseeable harm associated with the exposure of their PHI.

215.    Had Plaintiffs and Plaintiff Class Members known that Defendants would not adequately protect their PHI, Plaintiffs and Plaintiff Class Members would not have entrusted Defendant with their PHI.

216.    As a direct and proximate result of Defendants' negligence *per se,* Plaintiff and Plaintiff Class Members have suffered harm, including:

> a.    General damages for invasion of their privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;
>
> b.    Sensitive and confidential information including patient status and appointments that Plaintiffs and Plaintiff Class Members intended to remain private are no longer private;
>
> c.    Defendants eroded the essential confidential nature of the patient-provider relationship;

d.     Defendants took something of value from Plaintiffs and Plaintiff Class Members and derived benefits therefrom without Plaintiffs' and Plaintiff Class Members' knowledge or informed consent and without sharing the benefit of such value;

e.     and other harm resulting from the unauthorized use or threat of unauthorized use of stolen personal information, entitling them to damages in an amount to be proven at trial.

## VIII.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Certify the proposed Plaintiff Class, designating Plaintiffs Kim Naugle and Afrika Williams as the named representatives of the Class, and designating the undersigned as Class Counsel;

2.     Certify the proposed Defendant Medical Provider Class, designating Defendants Duke University Health System, Inc. and WakeMed as the named representatives of the Defendant Class, and designating their counsel as Defendant Class Counsel;

3.     Award compensatory damages, including statutory damages where available, to Plaintiffs and the Plaintiff Class against Defendants and the Defendant Class for all damages sustained as a result of Defendants' and the Defendant Class's wrongdoing, in an amount to be proven at trial, including interest thereon;

4.     Award punitive damages on the causes of action that allow for them and in an amount that will deter Defendants, the Defendant Class, and others from like conduct;

5.      Award attorneys' fees and costs, as allowed by law including, but not limited to, California Code of Civil Procedure section 1021.5;

6.      Award pre-judgment and post-judgment interest, as provided by law; and,

7.      For such other, further, and different relief as the Court deems proper under the circumstances.

DATED: September 1, 2022                    By: */s/James Harrell*
                                            Peter H. Burke*
                                            James Harrell, NC Bar No. 47787
                                            **CRUMLEY ROBERTS, LLP**
                                            2400 Freeman Mill Road, Suite 200
                                            Greensboro, NC 27406
                                            Telephone: (366) 333-9899
                                            phburke@crumleyroberts.com
                                            jrharrell@crumleyroberts.com

                                            Karen Hanson Riebel*
                                            Kate M. Baxter-Kauf*
                                            Maureen Kane Berg*
                                            **LOCKRIDGE GRINDAL NAUEN
                                            P.L.L.P.**
                                            100 Washington Avenue South, Suite 2200
                                            Minneapolis, MN 55401
                                            Telephone: (612) 339-6900
                                            khriebel@locklaw.com
                                            kmbaxter-kauf@locklaw.com
                                            mkberg@locklaw.com

                                            * *Pro hac vice forthcoming*

                                            *Attorneys for Plaintiffs and Proposed
                                            Class Counsel*